**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAILESH PATEL, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>NAPCO SECURITY TECHNOLOGIES, INC., RICHARD L. SOLOWAY and KEVIN S. BUCHEL<br>                              Defendants. | Case No. 1:25-cv-02308<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Shailesh Patel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Napco Security Technologies, Inc. ("Napco" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Napco's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Napco securities between February 5, 2024, to February 3, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Napco's overall expected growth and strength in the Company's hardware division. Defendants' statements included, among other things, confidence in Napco's ability to achieve its fiscal 2026 growth projections on back of its ability to both appropriately forecast and execute upon the alleged demand for its hardware products.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Napco's ability to forecast the demand for its products or otherwise the true state of Napco's negotiating position with distributors; notably, that, despite making lofty long-term projections and claiming one-off setbacks to hardware sales, Napco's forecasting processes fell short as sales continued to decline and, ultimately, derailed the Company's long-term projections. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Napco's securities at artificially inflated prices.

4.      On February 3, 2025, Napco announced its financial results for the second quarter of fiscal 2025, revealing a significant reduction in hardware sales for the quarter. The Company attributed the decline "primarily … to reduced sales from 2 of the company's larger distributors." As a result of the setback in sales, Defendants additionally pulled back their long-term 45%

EBITDA margin target, as they "don't know" if the target can be achieved by the end of fiscal 2026.

5.    Investors and analysts reacted immediately to Napco's revelation. The price of Napco's common stock declined dramatically. From a closing market price of $36.70 per share on January 31, 2024, Napco's stock price fell to $26.93 per share on February 3, 2025, a decline of about 26.62% in the span of just a single day.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Napco is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Napco common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Napco is attached hereto.

12.     Napco Security Technologies, Inc. is a New York corporation with its principal executive offices located at 333 Bayview Avenue, Amityville, NY 11701. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "NSSC."

13.     Defendant Richard L. Soloway ("Soloway") was, at all relevant times, the Founder, Chairman, Chief Executive Officer, President, and Secretary of Napco.

14.     Defendant Kevin S. Buchel ("Buchel") was, at all relevant times, the Executive Vice President of Operations, Treasurer, Chief Financial Officer, and Director of Napco.

15.     Defendants Soloway and Buchel are sometimes referred to herein as the "Individual Defendants." Napco together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Napco's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then

materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Napco is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Napco under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.    Napco develops, manufactures, and sells high-tech electronic security devices and provides cellular communication services for intrusion and fire alarm systems.

20.    The Company's primary security products encompass access control systems, door-locking products, intrusion and fire alarm systems, and video surveillance products.

21.    Napco's income stems both from these direct hardware sales and recurring monthly subscription service for its cellular devices.

### *The Defendants Materially Misled Investors Concerning Napco's Fiscal 2026 Margin Target and Claims of Continued Demand Growth for its Hardware Products*

#### *February 5, 2024*

22.    On February 5, 2024, Defendants conducted an earnings call corresponding to their Q2FY24 results.  In pertinent part, Defendant Soloway discussed their margin goals and growth plans for the equipment segment, stating:

> Gross margin for recurring service revenues was once again strong at 90%. And when combined with gross margin on equipment revenues of 29%, the total gross

margin for Q2 amounted to 53%, which compares to 34% for last year's Q2. We are particularly pleased to see the growth in equipment revenues, which was primarily attributable to the continued strength of locking revenue in addition to the improvement in intrusion sales.

. . .

***We believe we are well on our way to achieving our adjusted EBITDA margin target of approximately 45% on or about the end of fiscal 2026 as our targeted equipment sales reach $150 million and our recurring revenue service level reaches $150 million.***

. . .

As we have previously stated, the constraints of the supply chain have abated, and we believe in the coming months that, combined with new distributor sources we have developed, we will begin to invigorate our equipment sales and associated margins to even higher levels than any time before. As we have stated previously, the higher the hardware sales, the more overhead absorption occurs in our Dominican Republic factory and this expands our gross margins.

(Emphasis added).

23.    Defendants expanded further on their growth prospects during the question-and-answer portion of the call that followed during the following pertinent exchanges:

<Q: Chad Michael Bennett – Craig-Hallum Capital Group LLC – Senior Research Analyst> I think, Chad, we thought it was going to take a couple of quarters to get it behind us. We thought that this quarter would be affected similarly as it was in Q1. We saw a lot of progress in Q2, and hence you saw the big increase in radio sales in this quarter versus last. We're not done yet. We're not 100% there. We still have some work to do. I think at the end of Q3, it'll be all behind us. But the fact of what's occurred in Q2 did a lot to getting this issue behind us. And we're going to continue to work hard to make sure there's no issue left by the end of Q3.

<A: Kevin S. Buchel> I think, Chad, we thought it was going to take a couple of quarters to get it behind us. We thought that this quarter would be affected similarly as it was in Q1. We saw a lot of progress in Q2, and hence you saw the big increase in radio sales in this quarter versus last. We're not done yet. We're not 100% there. We still have some work to do. I think at the end of Q3, it'll be all behind us. But the fact of what's occurred in Q2 did a lot to getting this issue behind us. And we're going to continue to work hard to make sure there's no issue left by the end of Q3.

<Q: Chad Michael Bennett> And then just shifting to the locking side of the business. I think you talked about locking growth of roughly 10% year over year.

Just in terms of sell through there and demand there, were there any changes in demand in that business? And then I think you highlighted the verticals that you're seeing strength in. Should we think about that business differently from a growth rate relative to what you did this quarter, or was this quarter anomaly there?

<A: Kevin S. Buchel> Locking has done well for several quarters in a row, maybe last even couple of years in a row. So nothing unusual that gave us the strength. What's great is we have 2 locking companies; we have Alarm Lock and we have Marks, and both of them are firing on all cylinders. And that's why we're seeing the success in locking. So we expect that to continue for many quarters to come.

<Q: Chad Michael Bennett> And then maybe last one for me. EBITDA margins look phenomenal, continue to improve in the low 30s, I think, again, at least ahead of what I was thinking. I know we had some finance and accounting costs that rolled in this quarter, potentially maybe incrementally more rolling in the next quarter. But it seems to me like EBITDA margins are likely going from the low-30s to the mid-30s in a short period of time. Is that a fair assessment, Kevin?

<A: Kevin S. Buchel> Yes. ***Well, we're 32%. We're well on our way to the 45%. Going to take more time. We won't get to the 45%, obviously, by the end of this fiscal year***. But when you have 40% of your revenue generating 90% gross margins, which is what we have, the recurring now being roughly 40% of total revenues, that takes you a long way to getting to where we want to go. And we're going to keep adding, obviously, to that recurring. ***And we think the margins will get better on the hardware as we progress through the rest of the fiscal year. Between those 2 events, there's no reason why we shouldn't see the EBITDA margin go even higher in this fiscal year.***

. . .

<Q: Rajiv Sharma – B. Riley Securities, Inc. – Senior Analyst> Congratulations on the nice quarter, guys. My question is on the growth rate for the next few quarters or the next few years. Alarm and intrusion this quarter is about flat and locking was up 10%. Should we expect -- what kind of growth rate should we expect for the next few quarters? In line or ramping up?

<A: Kevin S. Buchel> Alarm was actually up this quarter. It wasn't flat. It was up by about 5%, actually. ***So we expect all in, we want to be 10% or greater. And this 6% that we were up for this quarter was very encouraging as we get back to a 10% or greater growth rate for hardware. In order to do that, we need all the players to be a part of it. That means the intrusion side, the locking, and the access***. The locking has been doing great, 2 companies, Alarm Lock and Marks, both firing on all cylinders. NAPCO was hurt by the radio decline, came back up 5% this quarter. ***We expect more, more because of Prima, more because of the new distributor, and more because radio sales will come back. So as we go forward, 10% or greater is what we're looking for.***

<Q: Rajiv Sharma> And the locking is the similar sort of a growth rate or higher?

<A: Kevin S. Buchel> Locking has been higher, being conservative, ***modestly, 10%. But they can do a lot more and have been***

(Emphasis added).

<u>*May 6, 2024*</u>

24.    On May 6, 2024, Defendants conducted their earnings call for the third quarter of fiscal year 2024.  In large part, Defendant Soloway reiterated the Company's fiscal 2026 goals, pertinently stating:

> ***We believe we are well on our way to achieving our adjusted EBITDA margin target of approximately 45% on or about the end of fiscal 2026*** as our targeted equipment sales reached $150 million and our recurring revenue service level reaches $150 million.
>
> . . .
>
> As we have previously stated, the constraints of the supply chain have abated, and ***we believe in the coming months and quarters that combined with new distribution sources we have developed, will begin to invigorate our equipment sales and association margins to even higher levels than any time before***. As we have stated previously, the higher the hardware sales, the more overhead absorption occurs in our Dominican Republic factory, and this expands our gross margins.
>
> . . .
>
> In the last 9 months of fiscal 2024, we have generated strong sales and profitability. We believe we can continue this growth well into the future as we work toward our fiscal 2026 goals and beyond.

(Emphasis added).

25.    A question-and-answer segment followed the Defendants' prepared remarks, during which the Defendants spoke further to their expectations for margin growth, particularly in the hardware segment, during the following pertinent exchanges:

<Q: Matt J. Summerville – D.A. Davidson & Co. – MD & Senior Research Analyst> Maybe first, if we can talk about hardware gross margins. Nice improvement year-on-year,

no doubt about it. But they've been kind of flattish for the last 3 quarters. Can you maybe talk about what the catalysts are as we look ahead outside of just overhead absorption to get that margin kind of marching more prominently towards your longer-term projection there? And then I have a follow-up.

<A: Kevin S. Buchel> Okay, Matt. Well, the overhead absorption is a big factor. I don't want to diminish it because in the past, it has led to our margins going from low to mid-30s to high 30s, low 40s. So it's significant when we put good numbers, strong hardware numbers on the board. But absent of that, the locking products, which now 66% of the hardware sales, that brings better margins than the -- some of the intrusion products, like the radio products, now granted the radio products lead to the recurring revenue, which is the best of them all, but on a pure hardware basis, the locking does better. And so we expect the locking products to continue to get stronger. Dick mentioned in his remarks, some of the reasons why locking strong school security is airport infrastructure upgrades projects that are going on in buildings and hotel renovations, and there's a lot of things going on that are contributing to locking. *We have 2 locking companies they're both operating really well, hitting on all cylinders, both of them at the same time. And so locking, which has been good, we expect it to get even stronger and that should help margins even further.* Those are probably the main reasons, the mix, more locking, but don't diminish the overhead absorption. It's a big factor.

. . .

<Q: Rajiv Sharma – B. Riley Securities, Inc. – Senior Analyst> On the equipment side, I had a question for Kevin or Dick, the alarms picked up sequentially 2%. And the year-on-year was down 12% for the intrusion and access alarms. It is great to hear that the sell-through in the dealers is up sequentially, 13%. I just wanted to understand, going forward, you're saying you see growth pick up from the FireMAX-2 and from picking up share with the new dealers. When should we see this pickup in the first half of fiscal '25 or second half?

<A: Kevin S. Buchel> Well, our hope and expectation, Raj, is we could start seeing it potentially in this Q4 that we're in now. The fact is 2 factors. One, the comps are much easier. Q4 last year was in a difficult comp. That combined with the sell-through stats that I referred to earlier, to bode well for an increase in the intrusion segment as we enter next fiscal year, more things should kick in. You should have contributions from the large dealers. You should have contributions from MAX, X2. You should have contributions from PRIMA. *These are all things that we expect is going to help that division to much better than it's been doing. And it's been doing well. It's like the unsung hero because the radio that it's contributing, while not at the same level as what they were in the height of the sunset, they are bringing -- those are the radios that are giving us this phenomenal recurring and the 92% margin. So it's doing great. It's going to do even better.*

. . .

<A: Richard L. Soloway> ***So our goal is to keep the streak up, hit that 2026 numbers and have that EBITDA of 45%. And that's it.*** We love to grow this business organically. But as I said, if an acquisition came around, which would be something that dealers would use regularly every day, like they put in our other products. That would be a nice tuck-in. We bring it in to our Dominican Republic, which has capacity to do $300 million, $100 million per shift, and we have room for another building alongside of it to do another $300 million -- it's a great place to manufacture. And we're very, very integrated, as you know, where we do all our engineering in-house. We don't farm it out, our own manufacturing in-house and have capacity. So the future is very bright for us.

(Emphasis added).

<u>*August 26, 2024*</u>

26.     On August 26, 2024, Defendants published their fourth quarter and full-year fiscal 2024 results.   During the corresponding earnings call, Defendant Buchel briefly spoke to the Company's hardware sales, stating, in pertinent part:

Locking sales grew 21% and 18%, respectively, as compared to Q4 and the 12 months ended June 30, 2023. Radio sales for the quarter were down 10% as compared to Q4 of last year due to the continued effect of the sun setting of 3G technology as well as the inventory levels of radios at that time at some of our distributors. Radio sales represent 59% of intrusion and access alarm product sales, and we expect inventory levels in distribution, which have decreased significantly over the past few quarters to continue to reduce, and that will lead to increased radio sales. ***As such, we expect radio sales to continue to be a key contributor to our hardware sales and lead to the continued growth of our highly profitable recurring service revenues.***

. . .

The increase in both gross profit dollars and gross margin for recurring revenue for the 3 and the 12 months ended June 30, 2024, was primarily the result of the previously mentioned increase in recurring revenues as well as a greater proportion of those revenues, being generated by our StarLink Fire radios, which generate higher monthly service charges than the other StarLink radios.

The increase in both gross profit and gross margin for equipment revenues, for both the 3 and 12 months ended June 30, 2024, primarily resulted from the aforementioned increase in equipment revenues as well as a favorable shift in product mix for locking products, which typically have a higher gross margin than intrusion products.

Another factor in the increased profit and gross margin for equipment revenue is increased overhead absorption from our Dominican Republic manufacturing facility, as well as the stabilization of component costs from the effects of the global supply chain crisis. Research and development costs for the quarter increased 28% to $3 million or 6% of sales, and that compares to $2.4 million or 5% of sales for the same period a year ago. Research and development costs for the 12 months ended June 30, 2024, increased 15% to $10.8 million or 6% of sales as compared to $9.3 million or 5% of sales for the same period a year ago. The increase for the 3 and the 12 months primarily resulted from salary increases and additional staff.

. . .

**Adjusted EBITDA for the quarter increased 18%** to $15.4 million or $0.41 per diluted share as compared to $13 million or $0.35 per diluted share for the same period a year ago. **And that equates to an adjusted EBITDA margin of 31%.** Adjusted EBITDA for the 12 months ended June 30, 2024, increased 72% to a 12-month record $58.9 million or $1.59 per diluted share and that compares to $34.3 million or $0.93 per diluted share for the same period last year **and equates to an adjusted EBITDA margin of 31%.**

(Emphasis added).

27.    Defendant Soloway ended the Company's prepared remarks for the call by speaking to their margin growth and expectations for the future, including the Company's ability to achieve their fiscal 2026 goals, stating, in pertinent part:

Fiscal 2024 was an amazing record-breaking year where we generated a net income of $49.8 million, adjusted EBITDA of $58.9 million and an adjusted EBITDA margin of 31%. **But as I've said before, there is more work to be done. While we continue to be encouraged with the gross margin for hardware sales of 31.4%, we believe this should improve further in fiscal 2025 and beyond**. Our strong net income, adjusted EBITDA and growing cash indicate the financial strength of our business.

As such, we are pleased to continue our dividend program and we'll be increasing the dividend -- quarterly dividend to $0.125 per share, a 25% increase over the $0.10, we paid last quarter. This will be payable on October 3, 2024 to shareholders of record on September 12, 2024. As always, we will strive to accomplish our goal of the continued financial strength, product innovation, technical superiority and strong profitability for fiscal 2025 and beyond.

And we believe we can continue this growth well into the future as we work towards our fiscal 2026 goals

(Emphasis added).

      28.    During the question-and-answer portion of the call, Defendants elaborated further

on how their margin goals would be achieved during the following pertinent exchange:

> <Q: Jeremy Scott Hamblin – Craig-Hallum Capital Group LLC – Senior Research
> Analyst> I want to come back to your equipment gross margins, which continue to
> make really strong progress. In terms of thinking about the progression that you're
> likely to make in FY '25, and then as you move forward from there because I think
> over time or maybe over the next couple of years, you expect that to get to 40%
> plus. But just wanted to get a sense for -- with noting that you have at least one
> distributor with a little bit of excess inventory, how do you expect that progression
> to play out here in 2025 and then beyond?
>
> <A: Kevin S. Buchel> Well, the margins will get helped a lot by 2 things: the mix
> and the volume. And the margins were helped this quarter, this past quarter, by both
> things, the mix and the volume. ***So the mix, having 65% of your sales being
> hardware sales of locking -- 65% being locking of the hardware sales, that has
> great margins. That helps a lot. I love radios. They don't have the best margins.
> Of course, they have the best margins in the recurring but we love locking on the
> hardware side***.
>
> So we need both, but what we saw this quarter was strong locking, which brings
> strong margin. And the volume, the volume going up helps. Because in our factory,
> in the Dominican Republic, we get leverage from pushing more volume through
> our factory because it's a labor-intensive factory. You need labor, a lot of labor. It's
> low-cost labor. You don't need much of anything else. So if you get busy, you add
> more labor. And if you add nothing else, you get overhead absorption. The margins
> expand and the money drops to the bottom line. We feel strongly that the volume
> is going to keep going, and it gets better and better.
>
> We recently bought our second Panasonic chip shooter machine. It's a $1 million
> machine. What it does? Inserts the components rapidly, more rapidly than anything
> we've ever had, the iPhones use this machine, and it gives you flexibility so you
> could change from one product to another product line without disruption. It's our
> second one. ***If we didn't believe that our hardware sales were going to be growing
> nicely, we wouldn't have bought a second machine. But that's our belief. And
> higher volume will lead to higher margins.***
>
> <Q: Jeremy Scott Hamblin> Just as a quick follow-up in terms of making that
> progression here over the next couple of years. So getting to 40% plus by FY '26,
> would be over 1,000 basis points of improved gross margins in your equipment
> piece of your business. Does that feel like an achievable target here over that time
> frame?

<A: Kevin S. Buchel> I guess we'll see how this year goes, but *we want to see the progression to close to 40% this year. And I think if we see that, then I'll feel good about our 2026 target. But we have to grow that top line hardware more than it's grown. We have to continue to see the strength from the locking, which we've seen now for several years in a row. And then the margins will go up.*

And historically, we've seen a tremendous amount of margin increase when the volume goes up. If you go back to our history, in 2018 and 2019, you'll see when the volume kicks up, the margins fly up. Back then, this was pre-COVID, our margins were pushing high 30s, low 40s. There's no reason we can't get back to that.

Now considering all the steps we've taken and that locking is a bigger piece of the pie, this is what we're pushing for. So look for the margins to keep going up during fiscal 2025, and then we'll be able to assess whether our goal for 2026 is achievable. What I will say is our goal for recurring revenue margin, which was 80%, is more than achievable. As you can see, it's 90%.

(Emphasis added).

<u>*November 4, 2024*</u>

29.    On November 4, 2024, Defendants provided their first quarter fiscal year 2025 results, underwhelming on equipment sales and causing a setback for their fiscal 2026 goals. During the corresponding earnings call, Defendants, for the first time in many quarters, did not acknowledge their 2026 goals.  Defendant Buchel did, however, detail the reasons for the Company's decline in equipment sales and overall equipment profit, stating in pertinent part:

*Equipment sales for the quarter decreased 6% to $22.9 million as compared to $24.4 million last year. This decrease was primarily due to locking sales decreasing 8%* as compared to fiscal Q1 2024 as partially offset by the aforementioned strong Starlink radio sales.

*The decrease in locking sales was primarily attributable to several locking distributors' efforts to temporarily lower their inventory levels. And this, we believe, is temporary, unlike the radios that were in the channel, which lasted several quarters. This is different.*

Gross profit for the 3 months ended September 30, 2024, increased 10% to $24.6 million with a gross margin of 56% as compared to $22.4 million with a gross margin of 54% for the same period last year. Gross profit for recurring service

revenues for the quarter increased 24% to $19.2 million with a gross margin of 91% as compared to $15.5 million with a gross margin of 90% last year.

Gross profit for equipment revenues in Q1 decreased by 22% to $5.4 million with a gross margin of 24% as compared to $6.9 million with a gross margin of 28% last year. ***The decrease in equipment gross profit was primarily the result of product mix, as the strong Starlink radio sales have a significantly lower gross margin than door locking products***, but, of course, ultimately lead to increases in our recurring revenue business.

. . .

***Adjusted EBITDA for the quarter decreased 4%*** to $12.3 million or $0.33 per diluted share as compared to $12.9 million or $0.35 per diluted share for the same period a year ago ***and that equates to an adjusted EBITDA margin of 28%.***

(Emphasis added).

30.    During the question-and-answer portion of the call, Defendants rejected the possibility of continued difficulties in their equipment segment during the following pertinent exchanges:

<Q: Matt J. Summerville – D.A. Davidson & Co. – MD & Senior Research Analyst> Kevin, in your prepared remarks, you mentioned several distributors temporarily lowering locking hardware inventory and that this situation is different than the multi-quarter trend you saw on the radio side. Help us understand why this is different and whether or not you think you can grow equipment revenues for the full year? And then I have a follow-up.

<A: Kevin S. Buchel> So, with radios, we were coming off of the 3G sunset where all the distributors were loading up because they couldn't get radio deliveries from anybody except us, and they had to be prepared for the sunset. So, we saw all of our distributors having a lot of inventory. And then when the sunset came and went, they had too much.

And we knew it was going to take several quarters for it to work its way through. And that's what happened. It took several quarters. And now we could say we're finished with that based on the very strong radio sales we saw in this quarter.

***With locking, it's much different. We can see from their inventory levels, we can see from the sell-through. This is a much different situation. They wanted to slow up in this quarter. Why? It's hard to say. Is it the election? I heard that from a few of the distributors. They want to wait until the election, then we'll start buying again. I heard that from some, it was budget related. They want to wait until the***

***new budget period because a lot of the projects start with an October 1 budget period.***

I talked to several of them personally, and they assured me that it was a one quarter type event. That's what I'm going by. Locking is strong. It comes from a lot of different avenues, schools, there's a lot of school activity. We're hopeful to announce a school win later this week. Stay tuned.

There's a bunch of hospital. Upgrade projects we're working on. So, we feel good about it. Don't take what happened in one quarter as being the new norm. That's how we feel. So, we think we'll grow as the year progresses. This is just one quarter.

Even with this, even with the disappointment of the locking, we still earned over $11 million, still 25% net income as a percentage of sales. It will come back over the next coming quarters. That's what we believe.

. . .

<Q: Jeremy Scott Hamblin – Craig-Hallum Capital Group LLC – Senior Research Analyst> Just as we look a little bit further ahead and kind of what you're driving towards for FY '26. And previously, you talked about your mix of business hoping to achieve 50-50 equipment revs to service revs in that fiscal year, you're getting close to that 50% already. And it sounds like quite a bit of momentum in the radio portion of your business.

Is there a potential for the service revenues to exceed equipment revs on a go-forward basis and take an even higher portion, particularly if the locking part of your business I know that, that sounds like it's a 1-quarter issue, but just in terms of visibility that you have on what that revenue mix might look like next fiscal year?

<A: Richard L. Soloway> ***Well, I would say we're pushing the pedal to the metal, both on the recurring revenue radio business and also on the hardware, the locking hardware business.*** The locking hardware business has been doing fabulously each quarter in the past. ***So, 1 quarter speed bump by a couple of distributors cannot be looked at as indicative of the future.***

***But we expect both the recurring revenue business with new products and the locking business with new products and getting more market share in both of those categories will drive us to higher heights than we've been talking about.***

We're here for the long haul, and we've got to keep investing in our engineering and our sales and marketing, and that's what we're doing. So, it's a very exciting future. We love leading the way in the security industry.

(Emphasis added).

31.    The above statements in Paragraphs 22 to 30 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Napco's optimistic margin growth goals and demand reassurances for the Company's hardware sales fell short of reality; the Company was simply not equipped to adequately forecast demand for its products or otherwise minimized the impact of potential demand fluctuations to continue to promote its lofty margin projections which relied upon continually increased sales volumes.

### *The Truth Emerges during Napco's Second Quarter Fiscal 2025 Earnings Report*

#### *February 3, 2025*

32.    On February 3, 2025, Defendants unveiled their second quarter fiscal year 2025 results below expectations, again due to setbacks in equipment revenue.  Highlighting these setbacks, Defendant Buchal provided the following details, in pertinent part:

> Net sales for the quarter decreased 9.7% to $42.9 million, and that compares to $47.5 million for the same period 1 year ago. Net sales for the 6 months ended December 31, 2024, decreased 2.6% to $86.9 million, and that compares to $89.2 million for the same period 1 year ago.
>
> . . .
>
> Equipment sales for the quarter decreased 25% to $21.7 million as compared to $29 million last year.
>
> The decrease in net equipment sales was primarily attributable to reduced sales from 2 of the company's larger distributors, one of which our largest customer who purchases both intrusion and locking products, eliminated all quarter end purchases from all manufacturers in order to reduce their inventory levels for their December 31 year-end.
>
> This distributor I spoke to personally, and he said, it's like an old Seinfeld line. He said, "it's not you, it's us." So it's a decision they made had nothing to do with our product. Our sell-through was good, the corporate decision they made. And the other one, there was another distributor who was going through a management

restructuring, and that resulted in a significant reduction in their purchase. And in addition to the timing of project work related to a significant New York City building renovation for custom locking products resulted in reduced sales in locking in our Q2 as this project began in fiscal 2024 and it's winding down in fiscal 2025.

***Equipment sales for the 6 months decreased 16% to $44.6 million as compared to $53.4 million for the same period, and the decrease was primarily due to the aforementioned reasons,*** I just mentioned. Gross profit for the 3 months ended December 31, 2024, decreased 2% to $24.4 million with a gross margin of 57% as compared to $25 million with a gross margin of 53% for the same period last year. The gross profit for the 6 months increased 4% to $49.1 million with a gross margin of 57% as compared to $47.4 million with a gross margin of 53% a year ago.

Gross profit for recurring service revenue for the quarter increased 16% to $19.4 million with a gross margin of 91%, and that compares to $16.7 million with a gross margin of 90% last year. And gross profit for recurring service revenues for the 6 months ended December 31, 2024, increased 20% to $38.6 million with a gross margin of 91%, and that compares to $32.2 million with a gross margin of 90% last year.

***Gross profit for equipment revenues in Q2 decreased by 39% to $5.1 million with a gross margin of 24% as compared to $8.4 million with a gross margin of 29% last year, and gross profit for equipment revenues for the 6 months decreased 31% to $10.5 million with a gross margin of 24% as compared to $15.2 million with a gross margin of 29% for the same period last year.*** The 400 basis point increase in overall gross margin is due to the continued very profitable recurring revenue. ***The decrease in gross profit and gross margin from equipment sales for both the 3 and the 6 months ended December 31, 2024, is primarily the result of the aforementioned lower sales levels as well as lower overhead absorption of fixed costs -- fixed overhead costs from our Dominican Republic manufacturing facility.***

. . .

***And adjusted EBITDA for the quarter decreased 19%*** to $12.2 million or $0.33 per share, and that compares to $15.1 million or $0.41 per diluted share for the same period last year. And that equates to an EBITDA margin of 28%, and that compares to 32% last year. And the adjusted EBITDA for the 6 months decreased 12% to $24.7 million or $0.67 per diluted share, and that compares to $28 million or $0.76 per diluted share for the same period last year, ***and that equates to an adjusted EBITDA margin of 28% this year compared to 31% last year***.

(Emphasis added).

33. A question-and-answer portion followed where Defendants walked back on whether they would achieve their 2026 goals, stating in pertinent part:

<Q: Jeremy Scott Hamblin – Craig-Hallum Capital Group LLC – Senior Research Analyst> I wanted to take a step back and ask more of a high-level question. You talked about kind of the push in 2026 towards a goal to get to a 50-50 split on your equipment versus your recurring service revenues and driving that business really to kind of $300 million in total revenues, which would imply $150 million in the RSR. It seems like that's not likely a goal that can be achieved from kind of current levels. But I wanted to get a sense for if you could maybe reframe for us where you think you could bounce back here and how we should be looking at the business, given that this is kind of a second straight quarter in which you've had adjusted EBITDA margins in the 28% range and kind of with that target that you had laid out before, you've been talking about maybe getting adjusted EBITDA margins up towards 40% plus. And I know that's still, I'm sure, the long-term goal, but I wanted to sense for what's a bit more kind of visibility on where you are with the business today.

<A: Kevin S. Buchel> Right. ***So our goal is to get the EBITDA margin in the mid-40s. And when we were at 32%, we were on our way to it. So now we've taken a step back. We're 28%.*** Still a very strong EBITDA margin, but not our goal. we'll hit our goal. We need a few things to happen. We need the recurring to continue to grow. I wanted to see it grow in the 20% range, as I said earlier.

When we originally created the goal, the $150 million, $150 million to 45% EBITDA target, the margin that we used was 80% because that's what it was at the beginning of this recurring revenue journey. Now it's 91%. And could it go higher? Yes, it could. But at 90% and grow it by 20% a year, that's step 1. ***Step 2, we need the equipment 10% increase, not what we saw this quarter, not what we saw last quarter. We need about 10%. We don't need anything more dramatic than that, but we need 10%. And we don't need -- because originally, we had margins much higher on the equipment than they're running now.***

***They need to be in the 30s. If we can get that, grow by 10%, margins in the 30s, get the recurring to grow 20%, 90% margin and keep your OpEx reasonable, grow it by maybe 10% more per year, then we'll be in the 40s. So I don't know if we'll get there exactly the original target was the end of '26, call it, 1.5 years from now. But we'll be -- we'll get there***. And we want to show that we're back -- well back to being on our way towards that goal. And the next couple of quarters, I think, will give that confidence.

<Q: James Andrew Ricchiuti – Needham & Company, LLC – Senior Analyst> Let me ask a follow-up question related to the equipment revenues. So to kind of reach these goals, you had kind of high 20s in terms of where your equipment revenue run rates had been, and that was yielding nice growth on your service revenues. In

terms of pushing forward to get those gross margins on your equipment revenues above 30% and kind of vis-a-vis getting your total company EBITDA margins at least to the mid-30s, let's say, as a starting point. what's the absolute dollar sales that you need or revenues that you need on an equipment perspective per quarter or on an annualized basis to think that those are reasonable targets to get those -- the gross margins for the equipment back up to 30% plus so that you can really push forward here on total company EBITDA margin?

<A: Kevin S. Buchel> *I would say $30 million hardware is the bare minimum of what we want, not unreasonable last year for 3 out of the 4 quarters, that's kind of where we were, a little below that.* The margins really grow and you get more sales flowing through your offshore factory.

Our Dominican factory, the more volume we push through it, the better the margins are. We've shown this in the past because when we get busy, we just have to add more direct labor. That's the lowest piece of the cost structure. We have a facility that can handle it. We have machinery that can handle it. We just bought another Panasonic chip shooter machine, which will give us even more efficiency to get us even better margins. So you need that volume. And as long as the mix is reasonable, you get there. Locking has to be a key part of the mix. It's been that way. Locking has margins in the 35% to 40% range.

We don't care so much about the radio margins, the hardware. It's all about the recurring. So as long as the mix is reasonable, the volume is in the 30 plus, we could be in the 30s. We've proved it in the past. It just happens, just add more direct labor, nothing else, more overhead absorption, margins expand. So we got to have that.

(Emphasis added).

34.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 5, 2024, May 6, 2024, August 26, 2024, and November 4, 2024, earnings calls. On those calls, Defendants continually praised the hardware division's sales execution as a key component for Napco's ability to grow its margins to achieve the 45% EBITDA margin forecasted for the end of fiscal 2026, while simultaneously minimizing risks associated with visibility, seasonality, the potential impact of the macro environment, and possible demand fluctuations for its hardware products.

35.    Investors and analysts reacted immediately to Napco's revelation. The price of Napco's common stock declined dramatically. From a closing market price of $36.70 per share on

January 31, 2024, Napco's stock price fell to $26.93 per share on February 3, 2025, a decline of about 26.62% in the span of just a single day.

36.     A number of well-known analysts who had been following Napco lowered their price targets in response to Napco's disclosures. For example, Craig-Hallum Capital Group, while downgrading to a hold rating summarized that "NAPCO delivered an incredibly disappointing FQ2 with a wide miss on sales and profitability as Equipment Revenues remained weak." Speaking to the Company's high margin goals for the end of fiscal 2026, the analyst further highlighted that "[g]iven the lag time between cellular radio orders and future RSRs we believe the update suggests the company will be far below the $300M with 40% Adj. EBITDA margin goals that management had targeted by the end of 2026." With respect to the hardware sales, the analyst further noted that "equipment sales have clear volatility as evidenced by several misses over the past year due to one or multiple distributors reducing orders. Notably, the misses appear to stem from orders not received in the last few weeks of a quarter, suggesting an imbalance in vendor/supplier relationship power."

37.     Similarly, Lake Street Capital Markets, while slashing their price target more than 25%, cautioned that, although "[m]anagement believes this is a one quarter issue," they "are worried that these headwinds are likely to persist throughout FY25, setting up this year to be a transition year from a growth perspective."

### Loss Causation and Economic Loss

38.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Napco's common stock and operated as a fraud or deceit on Class Period purchasers of Napco's common stock by materially misleading the investing public. Later,

Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Napco's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Napco's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

39.    Napco's stock price fell in response to the corrective event on February 3, 2025, as alleged *supra*. On February 3, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Napco's forecasting processes and growth guidance.

40.    In particular, on February 3, 2025, Napco announced a reduction in net equipment sales compared to the prior quarter, prior year, and overall market expectations. Defendants further signaled that Napco would no longer be able to meet its fiscal 2026 margin goals due to the reduction in equipment sales.

### *Presumption of Reliance; Fraud-On-The-Market*

41.    At all relevant times, the market for Napco's common stock was an efficient market for the following reasons, among others:

(a)    Napco's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Napco communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)      Napco was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)      Unexpected material news about Napco was reflected in and incorporated into the Company's stock price during the Class Period.

42.      As a result of the foregoing, the market for Napco's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Napco's stock price. Under these circumstances, all purchasers of Napco's common stock during the Class Period suffered similar injury through their purchase of Napco's common stock at artificially inflated prices, and a presumption of reliance applies.

43.      Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

44.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

45.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

46.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Napco who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Napco's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Napco's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Napco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of January 31, 2025, there were 36.4 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

49.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Napco;

(c)     whether the Individual Defendants caused Napco to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Napco's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Napco common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Napco's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Napco's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

57.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Napco's internal affairs.

59.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Napco's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

Napco's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Napco's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

60.    During the Class Period, Napco's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Napco's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Napco's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Napco's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Napco's misstatements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Napco which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Napco disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Napco to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Napco's common stock.

67.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Napco to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.    By reason of the above conduct, the Individual Defendants and/or Napco are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: April 25, 2025                         Respectfully submitted,

LEVI & KORSINSKY, LLP

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*